# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-594

**CRYSTAL ROSE MOFFETT**

**VERSUS**

**MARCUS DELANEY MOFFETT**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 84982
HONORABLE ANTHONY THIBODEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**J. LARRY VIDRINE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Candyce G. Perret, and J. Larry Vidrine\*,
Judges.

**REVERSED AND RENDERED IN PART, AND REMANDED.**

_____

\*Honorable J. Larry Vidrine participated in this decision by appointment of the Louisiana
Supreme Court as Judge Pro Tempore.

**Trent John Gauthier**
**Attorney at Law**
**100 Asma Boulevard, Suite 310-E**
**Lafayette, LA 70508**
**(337) 290-1806**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Marcus Delaney Moffett**

**Erika L. Green**
**Law Office of Erika Green, LLC**
**P. O. Box 73471**
**Baton Rouge, LA 70874**
**(225) 803-1333**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
**Crystal Rose Moffett**

**VIDRINE, Judge Pro Tempore,**

Marcus and Crystal Moffett were married December 5, 2008, and had one child, Sage Moffett, born September 29, 2009, before permanently separating October 10, 2016.

By Judgment of the 16th Judicial District Court dated August 29, 2018, Sage's parents were granted shared custody on a weekly rotating basis, and the mother was named domiciliary parent.

This controversy arose in July 2020, some two years later, and one year after Crystal became a secretary with a law firm in Baton Rouge that paid her far more than any job she could find in St. Martin Parish. Crystal had tired of commuting between Acadiana and Baton Rouge and expressed her intention to lease an apartment in Baton Rouge and have Sage live with her and enroll in school there.

In July 2020, both of Sage Moffett's parents filed Motions to modify the 7/7 Shared Custody Judgment awarding Crystal domiciliary status. By the time of their October 2020 hearing, Crystal had recently secured an apartment in Baton Rouge. During her seven days on with Sage, she and Sage had to travel, usually twice a day, between Baton Rouge and Acadiana so that Crystal could deliver Sage to school in Acadiana,[1] then return to work in Baton Rouge, and then return yet again to Acadiana after work to pick Sage up and return him to Baton Rouge in the evening.

Crystal's Motion to Amend the Custody Order proposed to have Sage relocate to live with her in Baton Rouge and attend school near her home there, but to allow

---

[1] Until shortly before the hearing, Sage attended school at St. Leo Catholic School in Lafayette about ten miles from his lifelong hometown Breaux Bridge. By the time of the hearing, Sage had been transferred by court order from St. Leo Cecilia Junior High School, although the reasons are unclear. The Court was plainly of the impression that St. Leo was no longer an available option at the time this Order was signed. Marcus's testimony suggests that he had not timely paid, as previously required, St. Leo's fees, either because Marcus did not know whether the Court was going to permit Crystal to enroll Sage in school in Baton Rouge, or because he preferred Sage to attend Cecilia Middle rather than St. Leo.

Marcus to enjoy visitation with Sage on most school weekends plus most of the summer to offset the time Marcus would lose on weekday mornings and evenings during the school year with Sage.

Marcus countered with his own Rule to Modify. Marcus agreed that it was no longer in Sage's best interest to continue with 7/7 shared custody but maintained that Sage would benefit more by remaining with him in St. Martin Parish and continuing his schooling there, surrounded by family, rather than attending school and living in Baton Rouge where Sage had never lived, and had little family and no friends to speak of. Marcus also requested that he be named Sage's domiciliary parent in St. Martin Parish.

*The Judgment Appealed From*

After hearing several hours of testimony, the trial court ruled from the bench in favor of Marcus, issuing oral reasons that were reduced to Judgment signed on February 12, 2021. The judgment granted the father domiciliary status and the mother "unfettered telephone access with Sage," plus visitation three weekends during non-summer months, with Sage's exchange to take place at the Tiger Truck Stop in Grosse Tete situated approximately halfway between Breaux Bridge and Baton Rouge. The Judgment also granted Crystal extensive summer visitation similar to that which Crystal had proposed for Marcus.

*Crystal's Appeal*

The record shows that Marcus's on-call work requirements often requires him to spend the night out of town on business, including during his seven days on with Sage. On appeal, citing *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054 (2000) and *Wood v. Wood*, 02-860 (La.App. 1 Cir. 9/27/02), 835 So.2d 568, *writ denied*, 02-2514 (La. 3/28/03), 840 So.2d 565, Crystal maintains that the effect of the trial court's custody decree awarding Marcus domiciliary status given this circumstance,

2

coupled with the requirement that Sage attend school in Acadiana, is tantamount to impermissibly prioritizing Sage's virtual stepmother[2] time with Sage in relation to her own.

Second, Crystal maintains that the court erred by implementing a custody plan where Sage would be alone at night several nights per month when his father worked out of town while Crystal would not have to leave Sage unattended overnight. In support of this contention, Crystal cites *Schmidt v. Schmidt*, 11-833 (La. App. 5 Cir. 5/31/12), 96 So.3d 1276.

Finally, Crystal maintains that the trial court erred in not giving adequate weight to Sage's testimony that it was in Sage's best interest to relocate to live with his mother and attend school in Baton Rouge rather than stay in Breaux Bridge. She cites *Fernandez v. Pizzalato*, 04-1676 (La.App. 4 Cir. 4/27/05), 902 So.2d 1112 in support of this position.

### *Marcus's Reply*

In reply to Crystal's brief, Marcus essentially argues that the trial court's judgment was neither manifestly erroneous nor clearly wrong, nor the result of a misapplication of the law.

### APPELLATE REVIEW STANDARD

As Marcus suggests, "[a] trial court is granted vast discretion in deciding child custody matters" and its decision will not be disturbed on appeal absent a clear showing of abuse of discretion even when a court of appeal is convinced that it would have weighed the evidence differently if acting as the trier of fact. *Carranza v. Carranza*, 2018-971 (La.App. 3 Cir. 6/5/19), 276 So. 3d 1028, 1032.

---

[2] While the evidence demonstrated that Marcus and his significant other had a close, committed relationship, it also showed that they were not married.

However, when such a judgment contains an erroneous application of the law, reviewing courts are not to apply the manifest error standard of review, but rather are to apply the de novo legal standard of review. *Kevin Assocs., L.L.C. v. Crawford*, 2003-0211 (La. 1/30/04), 865 So. 2d 34, 43, citing in part *Kem Search, Inc. v. Sheffield,* 434 So.2d 1067, 1071 (La.1983) ("[I]f the trial court's decision was based on its erroneous interpretation or application of law rather than a valid exercise of discretion, such an incorrect decision is not entitled to deference.") This principle also applies to legal errors concerning custody proceedings. *Masters v. Masters*, 33,438 (La.App. 2 Cir. 4/5/00), 756 So.2d 1196, *writ denied*, 01-3096 (La. 12/7/01), 803 So.2d 975.

*Bergeron* Standard of Review

*In Bergeron v. Bergeron*, 492 So.2d 1193, 1200 (La. 1986), the Louisiana Supreme Court stated, as follows:

> When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages          to          the          child.

We find that the trial court failed to apply the *Bergeron* standard with respect to the mother's continuing domiciliary status that previously had been conferred, and vacate the trial court's judgment.

In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child, and in reviewing this matter de novo, we do not for a moment forget whose interest comes first in this proceeding. It is Sage, the child formed of the union that once existed between the parties. In this case,

4

Crystal's acceptance of a position to earn more in Baton Rouge for herself and Sage is commendable.,

In similar fashion, the father's insistence upon remaining a vital part of Sage's life is commendable.

Still, the record evidence plainly shows that Sage's health condition and education demand more attention than can reasonably be provided by two parents, no matter how heroic, whose time is divided by other obligations, such as by his father's on-call schedule that requires Marcus to leave town several times per month without advance notice, or those of Crystal to unnecessarily spend valuable time on the road that could better be spent with her son on his educational and health needs. This Court lacks the authority required to run the Railroad, but not the authority to ensure that Sage's best interest is maximized while minimizing to the extent possible the hardship of those impacted thereby.

Both parents agreed to have Sage testify in accordance with *Watermeier v. Watermeier*, 462 So.2d 1272 (La.App. 5 Cir.) *writ denied*, 464 So.2d 301 (La. 1985), guidelines, evidencing their considerable confidence in Sage's ability to express a preference.

Reviewing the *Watermeier* transcript and other evidence *de novo*, there is no doubt of Sage's preference.

Sage liked the home that his mother had selected for them both because it was quiet and had modern conveniences, including readily accessible internet. Sage also preferred the school in Baton Rouge over Cecilia Junior High, stating that he found the Cecilia students more violent and vulgar in contrast with his brief experience with Parkview Baptist, where he said "they didn't, like take me for granted" and that "it was much nicer" than Cecilia Junior High.

Sage further observed that at Parkview Baptist he did not have to take the bus to and from school, unlike what he had to do at Cecilia Junior High School during his dad's seven days on since he was transferred to Cecilia upon his father's request, and that Parkview would certainly be better for both him and his Mom given their previous experience shuttling together between Baton Rouge and Cecilia: Sage testified that during the weeks when he is with his mother in Baton Rouge, Crystal would have to wake up at four in the morning and get him up at five so they could head out by seven in the morning to get to school in time, then not get back to Baton Rouge, exhausted, until eight or nine pm. This is what Sage had to say when asked about his travels between Baton Rouge and Acadiana during his *Watermeier* questioning:

> Q. I just – what I'm trying to figure out is, how is seven affecting you, if at all, you living in . . . Breaux Bridge.
>
> A. It's affecting me by when we come home, I'll be tired. Like, I don't want to do anything. I just want to sleep on my mom's side. On my dad's side, I'll be going on the bus. And then when I go by my mom, we be [sic] tired at the end of the day, 'cause she has to drive four times, from going to – from waking up, driving to Cecilia, driving back to her job in Baton Rouge, then my aunt picks me up. Then she has to drive from Baton Rouge, pick me up, and then we have to drive all the way back to our apartment in Baton Rouge.

Sage also testified that his father often travels to New Orleans, Louisiana for work and that his father's girlfriend, Michelle, stays with him during this time. Specifically, Sage testified:

Q. [By Ms. Green] You know where your dad works?

A. He works on the railroad.

Q. Okay. And is his railroad job in -- do you know where it's located?

A. It's located in Lafayette. He goes -- sometimes he goes to New Orleans.

Q. Do you know how often he goes to New Orleans?

A. He goes more than he goes in Lafayette, because they have a yard job and they have, like where they go to New Orleans. But most of the time, he goes to New Orleans.

Q. And when you're -- when you're going to his house for that week that you have, is he going to the yard any of that time during the week?

A. Most of the time, it will be at New Orleans. But sometimes he goes at a yard job.

Q. So who's with you when Dad's in New Orleans?

A. I'm by myself when I get back from school. But then after I get back from school, my -- Ms. Michelle will come and then she'll be there at about, like ten to twenty minutes after I get back from school.

Sage's testimony was also crystal clear about what his preference would be if 7 and 7 Shared Custody was no longer to be required:

Q. What if you had a choice between living with your dad or your mom full-time as opposed to one week here and one week there? Would there be something you would prefer or not prefer?

A. I'd prefer to live with my mom.

Q. Why?

A. Because I like the way how she, like cooks, and how she acts around me. Like, she'll help me here and there with my homework. But, like she'll let me be independent. But if I need help with my math, if I don't understand it, I'll either go to her. But if she doesn't remember, I'll go by my brother.[3]

## DISPOSITION

Given the totality of the evidence reviewed *de novo*, we conclude that the trial court erred as a matter of law in denying Sage's mother domiciliary status, particularly given that she is the only parent who could plainly and consistently attend to Sage's needs overnight during the school year. We further conclude that Crystal has discharged the weighty burden required by *Bergeron* of proving that this change is warranted.

---

[3] His brother is a college student.

7

While it is true that the outcome decreed here will reduce the time Sage's father has to enjoy Sage's company on weekday mornings and evenings during the school year, hopefully Marcus will take comfort in knowing that these losses will be offset by his having Sage three out of four weekends plus most of every summer, less the first week after and before school, to ensure that he and Sage will have abundant time on non-school days available for socialization, camping, hunting, riding four-wheelers and possibly attending baseball camps -- invaluable activities that Sage clearly shares with his father and other acquaintances.

The Court believes that this disposition will as nearly as possible afford each parent the time necessary to continue to provide for and nurture Sage, but do so in a way that minimizes Crystal's and Sage's need to travel excessively.

The Court further hopes this Court that this arrangement will be durable and thereby minimize the risks of the dangers noted by Justice James Dennis in *Bergeron v. Bergeron.*

Decree

For the foregoing reasons, the judgment of the trial court awarding the father Marcus Moffett with principal domiciliary status of the child Sage Moffett is REVERSED, with principal domiciliary status of the minor child Sage Moffett awarded to the mother, Crystal Moffett, with Sage allowed to attend School in Baton Rouge and live with his mother there throughout the school year, with issues related to child support and visitation REMANDED to the District Court for disposition not inconsistent with this Opinion.

REVERSED AND RENDERED IN PART, AND REMANDED.